**DEFAULT PROOF CREDIT CARD SYSTEM, INC., Plaintiff,**

v.

**HOME DEPOT U.S.A., INC. d/b/a The Home Depot, et al., Defendants.**

No. 03–CV–20094.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 30, 2004.

1326

Douglas M. Hall, Niro Scavone Haller & Niro, Chicago, IL, Sally Wiggins, David J. Sheikh, Raymond P. Niro, David Kenneth Friedland, Leslie Jean Lott, Lott & Friedland, Coral Gables, FL, for Plaintiff.

Annette Cristina Escobar, Astigarraga Davis Mullins Grossman, Miami, FL, Edward Maurice Mullins, Mark H. Izraelewicz, Marshall Gerstein & Borun, Chicago, IL, William H. Baker, Kevin M. Flowers, Robert Scott Newman, Marlow Connell Valerius Abrams Adler & Newman, Coral Gables, FL, Ian L. Saffer, Townsend Townsend & Crew, Denver, CO, Kenneth S. Chang, David E. Sipiora, Charles Howard Lichtman, Berger Singerman, Fort Lauderdale, FL, for Defendants.

## ORDER ON PENDING MOTIONS

ALTONAGA, District Judge.

THIS CAUSE came before the Court upon Defendants, Starbucks[1] and Wal-Mart's[2] Motion for Summary Judgment of Noninfringement (D.E.85), filed under seal; Defendant, Home Depot U.S.A., Inc.'s ("Home Depot") Motion for an Order Construing Claim 1 of U.S. Patent No. 6,405,182 (D.E.89); Home Depot's Motion for Summary Judgment that the Claims of U.S. Patent No. 6,405,182 are Invalid (D.E. 90); and Home Depot's Motion for Summary Judgment that its Gift-Card Program does not Infringe any Claim of U.S. Patent No. 6,405,182 (D.E.94), filed under seal. The Court has carefully considered the written submissions of the parties, pertinent portions of the record, argument of counsel, and applicable law.

## I. THE PLEADINGS

Plaintiff, Default Proof Credit Card System, Inc. ("Default Proof") brought this action against Defendants, Starbucks, Wal-Mart and Home Depot (collectively "Defendants") based on the alleged infringement of U.S. Patent No. 6,405,182 (the "'182 Patent"). Vincent Cuervo ("Cuervo" or "Mr. Cuervo"), the inventor of the '182 Patent, was born in Cuba and practiced law there until 1960 when he emigrated to the United States. Cuervo took a job as a door-to-door life insurance salesman in Miami. Cuervo was able succeed in the life insurance business due, in

---

1. Plaintiff has brought this action against the related entities, Starbucks Coffee Company and Urban Coffee Opportunities, LLC, which are collectively referred to as "Starbucks."

2. Plaintiff has also brought this action against the related entities, Sam's East, Inc., Wal-Mart Stores, Inc., and Wal-Mart Stores East, LP, which are collectively referred to as "Wal-Mart."

part, to his development of a system for providing lines of credit to the owners of life insurance policies based upon the cash surrender values of such policies. Cuervo was awarded United States Patent Nos. 4,718,009 and 5,025,138 on this novel system.

In 1986, Cuervo founded Default Proof to develop and promote his patented system. Default Proof alleges that Cuervo next developed a system for dispensing prepaid debit cards through automated teller machines and point of sale terminals. In August 2000, Cuervo was granted U.S. Patent No. 6,105,009 (the " '009 Patent") for a system of dispensing prepaid debit cards through automated teller machines. In June 2002, he was granted the '182 Patent for a "System for Dispensing Prepaid Debit Cards Through Point–Of–Sale Terminals." It is the '182 Patent that is the subject of this lawsuit. Default Proof alleges that Defendants have knowingly infringed at least Claim 1 of the '182 Patent through their manufacture, use, importation, sale and offer for sale of their respective store credit cards, electronic gift cards or other prepaid cards.

The First Amended Complaint, which is the operative pleading, was filed on April 24, 2003. It is a one-count Complaint for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. Default Proof seeks, *inter alia*, an injunction prohibiting further infringement and, specifically, enjoining further importation, manufacture, use, offer for sale and/or sale of gift cards within the scope of the '182 Patent, and enjoining Defendants from contributing to and/or inducing infringement of the '182 Patent.

Defendants answered the First Amended Complaint by asserting several affirmative defenses, including the defenses that Default Proof failed to state a claim upon which relief may be granted, that the claims of the '182 Patent are invalid for failure to comply with 35 U.S.C. §§ 102, 102, 103 and 112, and that Defendants have not infringed the claims of the '182 Patent either literally or under the doctrine of equivalents. All of the Defendants have also filed counterclaims against Default Proof, in which they request: (1) a declaratory judgment of non-infringement and non-liability pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201; and (2) a declaratory judgment of invalidity pursuant to 28 U.S.C. § 2201. Defendants maintain that one or more claims of the '182 Patent are invalid under one or more of the following statutory provisions: 35 U.S.C. §§ 101, 102, 103 and 112. Home Depot has also sought a judgment declaring that the '182 Patent is unenforceable and/or invalid due to Default Proof's misuse thereof.

## II. FACTUAL BACKGROUND [3]

### A. The '182 Patent Specification

The '182 Patent is a continuation-in-

---

**3.** Although Default Proof filed responses to Defendants' respective Statements of Undisputed Facts, the responses did not comply with S.D. Fla. L.R. 7.5. Rule 7.5 requires statements of material facts in support of or in opposition to a motion for summary judgment to be supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court. Default Proof's responses simply take issue with Defendants' selection of quotes from various documents, but do not offer evidence that contradicts that which is specifically referred to by Defendants. Therefore, the Court finds that the majority of Defendants' statements of fact are not controverted. Thus, the facts included in this section are taken from the parties' Statements of Undisputed Facts and the documentary evidence in the record, and are undisputed unless otherwise noted. Whenever Default Proof objects to Defendants' characterizations of certain facts, those objections are noted.

part[4] of the application that matured into the '009 Patent on August 15, 2000. The '009 Patent is incorporated by reference in the '182 Patent. The '182 Patent issued on June 11, 2002 to Vincent Cuervo. The title of the '182 Patent is "System for Dispensing Prepaid Debit Cards Through Point–of–Sale Terminals." The application number associated with the '182 Patent is 09/524,496 (the " '496 Application").

The "Abstract" of the invention describes:

> Point–of–Sale machines that allow individuals to obtain from participating merchants, "over-the-counter", [sic] prepaid debit cards. The amount of the line of credit is determined from the amount prepaid and credited to the debit card issuer, as payment for a simple purchasing transaction of merchandise or services. In this case the transaction is the purchasing of a prepaid PIN (personal identification number) required debit card.
>
> The prepaid debit cards will be instantly available and dispensed in different dollar amounts, after payment of the prepaid amount (line of credit) selected, and the purchaser has input required particular information and those of the transaction which are merged with one of the unique identification numbers and transmitted to a remote computer facility that acts as clearing house for the users' transactions. The remote facility, the debit card issuer, includes input and output means to communicate with the **point-of-sale terminal (debit card dispenser location)** and the associated circuitry to obtain the identification numbers of the debit cards being dispensed and the particulars of the users and the transactions. Adequate software is pro-

vided in the remote facility to permit users to access the same line of credit opened for one or more debit cards so that different users can remotely access and affect one or more lines of credit.

(emphasis added).

The specification describes in the "Background of the Invention" that "[t]he present invention relates to a system for *dispensing prepaid debit cards through computerized point-of-sale (POS) terminals.*" ('182 Patent, col. 1, lines 13–15) (emphasis added). In the next section of the specification, entitled "Description of the Related Art," the '182 Patent notes that the closest reference of prior art:

> *corresponds to U.S. Pat. No. 5,696,908 issued to Muehlberger in 1997 for a telephone debit card dispenser and method.* However, it differs from the present invention because it does not disclose the use of point-of-sale terminals (POS) to provide an injection on stacked "virgin" debit cards of any selected prepaid amount of funds (line of credit), security information (PINs, passwords, mother's maiden name, etc). And to include conditions for the validation and availability of those funds or line of credit [sic].

('182 Patent, col. 1, lines 23–32) (emphasis added).

The next section of the patent, entitled "Summary of the Invention," discusses the purported "objects of the invention." These are said to be, *inter alia,:* (1) "to provide a system for selling, dispensing and administering credit or debit cards" that "permits a user to acquire such debit or credit cards from widely available Point–of–Sale terminals using cash, debit and/or credit cards, check cards or ATM's

---

**4.** "A continuation-in-part application is one that repeats a portion of an earlier application but also adds matter not disclosed in the earlier one." *Chemithon Corp. v. Procter &* *Gamble Co.,* 287 F.Supp. 291, 298 (D.Md. 1968) (citing *Manual of Patent Examining Procedure,* sec. 201.08, 3d ed., Nov. 1961, U.S. Patent Office).

[sic] cards;" and (2) to "provide a system for selling, dispensing and administering credit or debit cards that require a minimum of paperwork, maintenance and financial disclosure from the card purchaser." (*Id.* at col. 1, lines 40–49).

There are two Figures described in the "Brief Description of the Drawings" that follow. In this section, the invention is described as consisting of "the details of combinations of electronic transactions." (*Id.* at col. 2, lines 7–8). The '182 Patent then includes two figures. Figure 1 is said to "represent[ ] the **hardware** used in the present invention," and Figure 2 "is a **flow chart** summarizing the process steps followed in typical transactions." (*Id.* at col. 2, lines 11–14) (emphasis added). Figures 1 and 2 are included below in the Appendix to this Order.

In Figure 1 of the '182 Patent, a box labeled "DISPENSER" is numbered "40" and a *separate* box labeled "P.O.S." is numbered 54. The two boxes are connected by a line. An arrow from the "DISPENSER" extends to another box labeled "D.C.," which indisputably stands for "debit card." The user of the device, numbered 30, is represented by a stick figure in Figure 1. In Figure 2 of the '182 Patent, the last step, after "D.C.C.H. VALIDATION," is "VALIDATING DATA RECEIVED AND D.C. DISPENSED."

The final section of the specification contains a single preferred embodiment and seven claims. The parties have limited their arguments in the pending motions to a discussion of Claim 1 of the Patent. Claim 1 of the '182 Patent reads as follows:

1. A system for *dispensing* and validating prepaid debit and credit cards, comprising:

A) a point-of-sale assembly including first computer means with associated first storage means that further include first input and output means for entering information from a user per-

taining to his or her particulars and the particulars of the transaction in said first storage means, [sic] said first input means includes a keypad assembly, a bill acceptance port and a credit/debit card charge assembly and further including means for validating the funds made available through said input means so that a line of credit is computed by said first computer means and stored in said first storage means with a validation signal and a block of information is assembled and ready for transmission;

B) *means for dispensing at least one debit card for each transaction,* and each of said debit cards including means for storing a unique identification number, and said debit cards being dispensed only after a first predetermined number of conditions have been met and said validation signal is received from said point of sale assembly; and

C) a remotely located computerized clearing house assembly, including second computer means with associated second storage means, second input and output means for receiving and sending said block of information from and to said point of sale assembly and said second storage means further including data and instructions to process said block of information so that a line of credit is entered for each of said identification numbers.

('182 Patent, col. 3, lines 33–45; col. 4, lines 1–19) (emphasis added).

Claims 2 to 7 of the '182 Patent are dependent, either directly or indirectly, on Claim 1, and read as follows:

2. The system set forth in claim 1, wherein the instructions and data in said second storage means permit a user to link more than one of said identification numbers of said debit cards to one line of credit thereby permitting more than

one users [sic] to simultaneously access said credit line.

3. The system set forth in claim 2 wherein the instructions and data in said second storage means permit an issuer to affect the line of credit of the users upon the occurrence of a second number of predetermined conditions.

4. The system set forth in claim 3 wherein said second number of predetermined conditions includes the passage of time with unused balances.

5. The system set forth in claim 4 wherein the users can send and receive funds through the use of linked debit cards over a network of remotely distributed point of sale assemblies.

6. The system set forth in claim 5 wherein said line of credit is calculated by an issuer in one or more preselected foreign currencies.

7. The system set forth in claim 6 wherein a predetermined number of incentives are added to said line of credit, selectively, upon the occurrence of said second number of predetermined conditions.

(*Id.* at col. 4, lines 21–43).

The pertinent portions of the "Detailed Description of the Preferred Embodiment" with respect to the preceding limitations in Claim 1 are as follows:

*The merchant or dispenser* of the card issuer 41 .... Computerized clearing house 56 and a telecommunications network 60 connecting them. For the purpose of this application, a purchaser 30 [5] will be deemed a debit or credit card purchaser or holder. *Dispenser will [sic] the merchant or the entity or place selling the card, and an issuer will be the entity or financial institution issuing the card. Dispenser 40 is loaded with three or more stacks of debit cards* with a digital storage number 46 wherein a unique identifying serial number has been recorded....

As shown in FIG. 1, a card purchaser 30 initiates the process when approaching a merchant offering the sale of prepaid debit cards through the Point-of-Sale terminals, requesting information regarding the different prepaid amounts of cards are available, once the purchaser decides the prepaid amount desired in the debit card to be purchased, depending on the jurisdiction's regulations, it may be obviated (bearer debit card) or it may be required the disclosure of the name, address, and the social security number [sic]. The purchaser 30 (or card holder) validates the funds in the card for further future use, through the input, of the always required to enter confidential four digits [sic] number or number and letters combined, the PIN (personal identification number), and his/her mother's maiden name 44, this last one for security purposes only (for replacement if the card is stolen or lost). The issuer 41 of the card determines the amount of information it will require, or make optional, leaving latitude and flexibility for the purchaser as to how much information wants to disclose [sic]. The more information he or she discloses the more secure the debit card will be.

\* \* \* \* \* \*

The particulars of the user and the transaction, as well as the serial number(s) being dispensed, will be assembled in the predetermined manner and forwarded through network 60 clearing house 56, and through the existing facilities provided by the point-of-sale terminals.

---

5. The numbers in the quoted text refer to items depicted in the drawings that accompany the specification.

(*Id.* at col. 2, lines 25–57; col. 3, lines 21–26)(emphasis added). The preferred embodiment provides further details regarding the processing of transactions by stating that:

> The following step pertains to entering information about the transaction such as the amount to be deposited and method of payment (cash, from a bank card). If the transaction is cash the merchant collects the cash as if it is a merchandise or paying for services routine transaction but entering the being purchased [sic] debit card issuing bank's ID number, right after the purchaser obtains the "virgin" not validated debit card for the amount he or she has prepaid minus a small processing % fee. A net prepaid amount is credited, and the debit card is slid into 54(POS) this time as a credit charge of the net prepaid amount.

(*Id.* at col. 2, lines 65–67, col. 3, lines 1–8).

### B. The Prosecution History of the '182 Patent (including the '009 Patent)

The '496 Application is a "continuation-in-part" of an earlier-filed application, serial number 09/128,088, which was filed on August 3, 1998 (the " '088 Application") and which issued as the '009 Patent on August 15, 2000. Claim 1 of the '009 Patent discloses:

> 1. An automated machine for *dispensing* debit cards, comprising:
>
> A) an automated teller machine assembly including first computer means with associated first storage means that further include input and output means . . ., said first input means includes a keypad assembly, a bill acceptance port and a credit/debit card charge assembly and further including means for validating the funds made available through said input means so that a line of credit is computed by said first computer means and stored in said first storage means with a validation signal and a

block of information is assembled and ready for transmission;

> B) *means for dispensing at least one debit card for each transaction,* and each of said debit cards including means for storing a unique identification number, and said debit cards being dispensed only after a first predetermined number of conditions have been met and said validation signal is received from said automated teller machine; and
>
> C) a remotely located computerized clearing house assembly, including second computer means with associated second storage means, second input and output means for receiving and sending said block of information from and to said automated teller machine and said second storage means further including data and instructions to process said block of information so that a line of credit is entered for each of said identification numbers.

('009 Patent, col. 3, lines 30–46; col. 4, 1–15) (emphasis added).

The Abstract of the '009 Patent discloses "[a]n automatic *machine for dispensing* debit cards that includes an automated teller machine (ATM) with input and output capabilities *and a dispenser for debit cards* . . . ." (emphasis added). The preferred embodiment discloses the details regarding a particular transaction that is one of the preferred embodiments of the invention. Figure 1 "represents a block diagram of the system *hardware* used in one of the preferred embodiments," and Figure 2 "represents an *algorithm for the steps* required to dispense a debit card." (*Id.* at col. 1, lines 65–68; col. 2, lines 1–2) (emphasis added). In the "Detailed Description of the Preferred Embodiment," the '009 Patent discloses:

> Referring now to the drawings, where the present invention is generally referred to with numeral 10, it can be

observed that it basically includes *a system for dispensing* and controlling debit cards and it includes basically *debit card dispenser 20,* automatic teller machine (ATM) assembly 30 computerized clearing 60 and a telecommunications network 80 connecting them. For the purposes of this application, a user will be deemed a debit card purchaser or holder. An issuer will be the entity issuing the debit cards. *Dispenser 20 is loaded with a stack 21 of debit cards 22 with a digital storage member 24 wherein a unique identifying serial number has been recorded. Dispenser 20 includes an ATM assembly 30 with the necessary input and output hardware, such as keypad 32, bill acceptance assembly 34, card charge assembly 35, display 36, printer assembly 38, computer assembly 40 and associated storage assembly 42 . . . .*

The next step pertains to entering information about the transaction such as the amount to be deposited/withdrawn and method of payment (cash, debit or credit card). If the transaction is a deposit, the bills are validated or the debit/credit cards verified in a conventional manner by electronically contacting clearinghouse 40 which in turn connects with the credit/debit card issuer (not shown) in a conventional manner.

('009 Patent, col. 2, lines 5–49)(emphasis added). Figures 1 and 2 of the '009 Patent are shown below.

The '496 Application which issued as the '182 Patent was originally filed with claims 1 to 7 from the earlier-issued '009 Patent. On May 23, 2001, the patent examiner rejected claims 8–14 of the '496 application based on "double patenting" pursuant to 35 U.S.C. § 101. The patent examiner stated the following as the basis for the initial rejection:

Claims 8–14 are rejected under 35 U.S.C. [§ ] 101 as claiming the same invention as that of claims 1–8 of prior U.S. Patent No. 6,105,009. This is a double patenting rejection.

The only difference between the claims of the instant application and aforementioned Patent is the terminology used. Specifically, in the Patent in claim1, item A, the terminology used therein is an "automated teller machine", [sic] whereas in claim 8 of the instant application is "a point-of-sale assembly". [sic] These recitations appear to describe the same device.

It is noted that if it can be demonstrated that the terminology used in the instant application is of different scope than that of 6,105,009, then the following rejection applies.

Claims 8–14 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1–8 of U.S. Patent No. 6,105,009. Although the conflicting claims are not identical, they are not patentably distinct from each other because the claims only differ in scope.

(Thomas A. Gafford ("Gafford") Decl., Ex. 4, at 45–46).

Mr. Cuervo's attorney filed a "Preliminary Amendment" to the '496 Application on August 24, 2000. In the remarks accompanying Mr. Cuervo's Preliminary Amendment to the '496 Application, the attorney states:

Applicant filed this application *pro se.* The enclosed proposed claims are similar in language and scope to the claim originally filed. *The preamble has been changed to clearly indicate that the system claimed is an apparatus.* Other minor changes have been introduced to comply with accepted claim drafting practices. The original figure *I has been broken down in two figures to separate the hardware from the steps involved in using it.*

The specifications were amended to bring them more in line with the claimed subject matter which basically extends those claims of the allowed parent application to include the use of a point-of-sale assembly (POS) instead of an automatic teller machine (ATM).

(Kevin M. Flowers ("Flowers") Decl., Ex. 4, p. 33)(emphasis added).

In response to the patent examiner's initial rejection for double patenting, Mr. Cuervo filed another amendment by adding a terminal disclaimer [6] to the '496 Application by which he disclaimed the portion of the term of any patent resulting from the '496 Application that would extend beyond the expiration date of the '009 Patent. (Flowers Decl. Ex. 7 ('182 Patent Prosecution History, Paper No. 10)). The remarks accompanying Mr. Cuervo's terminal disclaimer clarified the scope of his invention as follows:

The Examiner has stated that an automated teller machine is equivalent to a point-of-sale assembly. Applicant disagrees.

*An automated teller machine dispenses money through its mechanism in response to a validated transaction. A point-of-sale assembly does not include such a mechanism. Applicant encloses print outs of commercially available P.O.S. products (Items 1 and 2) and commercial available ATM's (Item 3 and 4).*

The Examiner has included several references in form PTO–872. These patents disclose change dispensers. They provide change to cash purchases. However, they are different than [sic] ATM. But even if they were, for the purposes of this application, the structure is different and the claims have different scope.

*It is clear that a merchant operates, in the present invention, a P.O.S. assembly to validate a transaction prior to dispensing a card. To that extent, the present claims are broader.*

(Gafford Decl., Ex. 4, at 52) (emphasis added).

In the remarks accompanying the Notice of Allowability, the patent examiner commented on the allowable subject matter of the '496 application. The examiner stated as follows:

Claims 8–14 are allowed.

The following is an examiner's statement of reasons for allowance: the prior art fails to teach or suggest the invention defined in claims 8–14 of the instant application. In particular, the closest prior art to Muehlberger et al. and Peters fails to teach means for storing a unique identification number on each debit card and a remotely located clearing house assembly for receiving and sending the block of information to and from the point of sale assembly, and wherein the clearing house assembly having a second storage means which includes data and instructions to process the block of information so that a line of credit is entered for each of the identification numbers.

(Gafford Decl., Ex. 4, at 88).

■ The final document that is relevant to the claim construction and invalidity analysis is the patent issued to Karl Muehlberger on December 9, 1997, Patent No, 5,696,908, for a "telephone debit card dispenser and method" (the "Muehlberger Patent").[7] As already mentioned, Mr.

---

6. The terminal disclaimer was filed to overcome any double-patenting concerns. (Gafford Decl., Ex. 4, at 52).

7. Prior art cited in a patent or in the prosecution history of the patent constitutes intrinsic evidence. *See Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed.Cir.2003) (citing *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1371–72 n. 4 (Fed.Cir.2002); *Vitronics Corp. v. Concep-*

Cuervo cited the Muehlberger Patent as the "closest reference" in the '182 Patent. The Abstract of the Muehlberger Patent states that, in using the invention, "[p]re-paid cards and printed cards are dispensed," or "[o]ptionally, printed receipts are dispensed including an access code and prepaid value." The specification discloses throughout an "*apparatus* for dispensing a card for use in debit purchasing from a vendor ....," and calls for "electro-mechanical dispensing" of each card. (emphasis added). It is specifically stated that the apparatus comprises a "printer." The apparatus also contains "a means for storing the cards from the group consisting of discrete stacked cards and a continuously [sic] roll of separable cards...."

The specification also refers to a "dispenser operator," which "may be a convenience store operator or any retail distribution center." However, the "dispenser operator" does not actually dispense the debit cards, but rather is only involved in selecting the options of telephone service carriers and possible values of the telephone debit cards from which the debit card purchaser can choose. The "dispensing" occurs in a "dispenser port," which is output from a "dispenser module," and which constitutes the "dispensing" hardware. The inventor further described the components of the system that perform the "dispensing" function as follows:

> The control and connections to a *single dispenser module* 11 *or multiple dispenser modules* 11, 11a, as illustrated with reference to FIG. 7, are performed by the interface and control board 80 through a marshalling and distribution board 86. Each *card dispenser module* 11 or 11a has an associated bar code

sensor 84, 84a, and paper and card storage 85, 85a also interfacing with the interfacing control board 80 through the marshalling and distribution board 86. As illustrated with reference to FIG. 7 and as earlier described, it is anticipated that *multiple dispenser modules 11 and bar code sensors 84 are located within a single dispenser apparatus 10.*

(emphasis added).

## III. DEFENDANTS' MOTIONS AND THE STANDARD OF REVIEW

Home Depot has filed a Motion for an Order Construing Claim 1 of the '182 Patent, a Motion for Summary Judgment finding that the Claims of the '182 Patent are Invalid, and a Motion for Summary Judgment finding that its Gift–Card Program does not Infringe any Claim of the '182 Patent. Home Depot has requested that the Court construe only three limitations contained in Claim 1:(1) "means for validating the funds," (2) "means for dispensing," and (3) "bill acceptance port." Starbucks and Wal–Mart joined in Home Depot's Motions relating to claim construction and invalidity, filed memoranda in support of these Motions, which the Court indicated it would accept and consider, and filed their own Motion for Summary Judgment of Non–Infringement. Starbucks and Wal–Mart request that the Court adopt Home Depot's proposed claim construction with respect to "means for validating" and three other related Claim 1 terms pertaining to validating and computing a line of credit. As to all other claim elements raised in connection with claim construction, Starbucks and Wal–Mart join in the positions set forth by Home Depot in its moving and reply claim construction

*tronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir. 1996); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979–80 (Fed.Cir.1995)). While the parties did not make the Muehlber-

ger Patent a part of the record, the Court has obtained and considered the Muehlberger Patent in arriving at this claim construction.

briefs. Accordingly, Starbucks and Wal–Mart request that the Court adopt Home Depot's proposed constructions of Claim 1 as well as Home Depot's stated reasons for finding the '182 Patent invalid.

In this Order, the Court only addresses the issues of claim construction and invalidity with respect to one of the disputed claim limitations of Claim 1—"means for dispensing." Because the Court finds that this means-plus-function claim limitation is indefinite, which makes Claim 1 invalid for indefiniteness pursuant to 35 U.S.C. § 112, ¶ 2, the Court does not reach claim construction of the other disputed claim limitations of Claim 1 or the issue of infringement of Claim 1.

Under Rule 56(c), Fed.R.Civ.P., a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court explained the movant's burden in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) as follows:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. 2548. The Court further stated that "Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genu-

ine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548.

By its very terms, this standard provides that the mere existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir.1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646. On a motion for summary judgment, the court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Allen*, 121 F.3d at 646.

While the burden on the movant is great, the non-moving party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is "merely colorable" or "not significantly probative," is not enough. *Id.; see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir.1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment). Moreover, otherwise

admissible evidence may be submitted in inadmissible form at the summary judgment stage. *See McMillian v. Johnson,* 88 F.3d 1573, 1584–85 (11th Cir.1996); *Gaston v. Home Depot USA, Inc.,* 129 F.Supp.2d 1355, 1361 (S.D.Fla.2001)

## IV. ANALYSIS

### A. *Claim Construction of the Disputed Limitations of Claim 1*

#### 1. *The Analytical Framework*

#### a. The General Framework

In construing patent claims, the trial court must discern the ordinary and customary meanings attributed to the words used. Standard dictionaries of the English language may help identify the ordinary meaning of a claim term. *Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313, 1325 (Fed.Cir.2002); *Inverness Medical Switzerland GmbH v. Princeton Biomeditech Corp.,* 309 F.3d 1365, 1369 (Fed.Cir.2002); *Optical Disc Corp. v. Del Mar Avionics,* 208 F.3d 1324, 1334–35 (Fed.Cir.2000). Once the court has determined the ordinary and customary meaning of the terms, there is a heavy presumption that those definitions are the proper meanings. *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed.Cir.2002) ("The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art."). Thus, patent infringement analysis begins and must remain focused upon the words of the patent claims themselves to determine the ordinary and customary meanings of those terms, but "unless compelled otherwise, a court will give a claim term the full range of its ordinary meaning as understood by persons skilled in the relevant art." *Id.*

The presumption that words have their ordinary meanings when used in a patent claim is rebutted, however, where the patentee, acting as his own or her own "lexicographer," has clearly set forth a definition of a claim term that is different from the term's ordinary and customary meaning. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) ("Although words in a claim are generally to be given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.") (citing *Hoechst Celanese Corp. v. BP Chemicals, Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996)) ("A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning."). The presumption is also rebutted if the inventor has disavowed or disclaimed a scope of coverage by using words or "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex,* 299 F.3d at 1324, 1325 ("The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). Finally, where the term or terms chosen by the patentee so deprive the claim of clarity that there is " 'no means by which the scope of the claim may be ascertained from the language used,' " the presumption is rebutted. *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1268 (Fed.Cir.2001) (citing *Johnson v. Worldwide Assoc. Inc. v. Zebco Corp.,* 175 F.3d 985, 989 (Fed.Cir.1999)). "Where ... the patentee has clearly defined a claim term,

that definition is '[u]sually dispositive.'" *Jack Guttman, Inc. v. Kopykake Enters., Inc.,* 302 F.3d 1352, 1360 (Fed.Cir.2002).

After the court has determined the ordinary and customary meanings of the terms at issue, it may then look to the rest of the intrinsic evidence, including the patent specification and file history. *Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313, 1324–26 (Fed.Cir.2002). The Federal Circuit has explained that, in examining the file history, the court may examine the prior art cited therein:

> In addition, a court in its discretion may admit and rely on prior art proffered by one of the parties, whether or not cited in the specification or the file history. This prior art can often help to demonstrate how a disputed term is used by those skilled in the art. Such art may make it unnecessary to rely on expert testimony and may save much trial time. As compared to expert testimony, which often only indicates what a particular expert believes a term means, prior art references may also be more indicative of what all those skilled in the art generally believe a certain term means. Once again, however, reliance on such evidence is unnecessary, and indeed improper, when the disputed terms can be understood from a careful reading of the public record.

*Vitronics,* 90 F.3d at 1584.

■ An analysis of the intrinsic record is particularly important because words often have multiple dictionary meanings. The intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is "most consistent with the use of the words by the inventor." *Texas Digital,* 308 F.3d at 1203–04 ("'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'")

(citing *Dow Chemical Co. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1372–73 (Fed. Cir.2001); *Reinshaw PLC v. Marposs Società per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir.1998)); *Brookhill–Wilk 1, LLC v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1300 (Fed.Cir.2003) ("[T]he general meanings gleaned from reference sources, such as dictionaries, must always be compared against the use of the terms in context.... 'Where there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meanings.'") (citations omitted).

Moreover, among the intrinsic evidence, "the specification is always highly relevant to the claim construction analysis." *Vitronics,* 90 F.3d at 1582; *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (Dictionary definitions are a useful first step, but "[c]laims must be read in view of the specification, of which they are a part."); *Bell Atlantic Network Servs. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1267 (Fed.Cir. 2001) (The intrinsic evidence, *i.e.,* the surrounding claim language, the patent specification and the file history—provide "'the most significant source of the legally operative meaning of disputed claim language.'") (quoting *Vitronics,* 90 F.3d at 1582).

■ Claims should be construed to encompass all definitions that are consistent with the use of the word in the intrinsic record, except those that have been disclaimed. *Brookhill–Wilk,* 334 F.3d at 1299 ("If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim may be construed to encompass all consistent meanings."); *see also Texas Digital,* 308 F.3d at 1203 (same). Identical terms appearing in the same or related patents should be construed identically. *See, e.g.,*

*Process Control Corp. v. Hydreclaim Corp.,* 190 F.3d 1350, 1356 (Fed.Cir.1999).

 Now, "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics,* 90 F.3d at 1583 (citations omitted). *See also Brookhill–Wilk,* 334 F.3d at 1304 (quoting *Vitronics,* 90 F.3d at 1582) ("I[f] an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term, ... it is improper to rely on extrinsic evidence."). The Federal Circuit has consistently emphasized that "extrinsic evidence," *i.e.,* anything outside of the intrinsic evidence—may not be used in claim construction to vary the meaning of claim terms as reflected in the intrinsic record. *Vitronics,* 90 F.3d at 1583. In particular, "[e]xpert testimony ... may not [be used to] ... diverge from the description of the invention as contained in the patent documents." *Aqua–Aerobic Sys., Inc. v. Aerators, Inc.,* 211 F.3d 1241, 1245 (Fed.Cir. 2000). Although the court may rely on the evidence from experts "to educate itself about the patent and the relevant technology, the claims and the written description remain the primary and more authoritative sources of claim construction." *Mantech Envtl. Cor. v. Hudson Envtl. Servs., Inc.,* 152 F.3d 1368, 1373 (Fed.Cir.1998).

 Whether or not an ambiguity exists, a court may consider extrinsic evidence, such as expert testimony, as to how those skilled in the art would interpret the claims. The construing court may consider opinions and advice of experts to explain the meaning of terms as they are used in patents and as they would be perceived and understood in the pertinent field of invention. *See Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.,* 347 F.3d 1367 (Fed.Cir.2003). For example, to construe the meaning of a patent term, a court must consider what was known to one of ordinary skill in the relevant art at the time of filing, in addition to the claims themselves, the specification, the prosecution history, and dictionaries and treatises. *See Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313 (Fed.Cir.2002); *Bayer AG. v. Biovail Corp.,* 279 F.3d 1340 (Fed.Cir.2002). However, regardless of how those skilled in the art would interpret a patent term in other situations, the court must give it the meaning indicated by the patentee in the patent claim, specification and file history. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed.Cir.1996); *see also Goldenberg v. Cytogen, Inc.,* 373 F.3d 1158 (Fed.Cir.2004) (although expert testimony and declarations are useful to confirm that construed meaning of patent term is consistent with denotation ascribed by those in field of art, such extrinsic evidence cannot be used to vary plain language of patent document).

 Statements made by the applicant during the patent prosecution "regarding the meaning of a claim term are [also] relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary." *CVI/Beta Ventures v. Tura LP,* 112 F.3d 1146, 1155 (Fed.Cir.1997); *Southwall,* 54 F.3d at 1578. *See also Laitram Corp. v. Morehouse Industries, Inc.,* 143 F.3d 1456, 1462 (Fed.Cir.1998) (arguments made by the applicant during prosecution, whether or not actually relied upon by the PTO examiner, are relevant to the construction of claim terms).

b. Interpreting Means–Plus–Function Claim Limitations

 Additional claim construction rules apply to mean-plus-function elements. *British Telecomm. PLC v. Prodigy Comms. Corp.,* 189 F.Supp.2d 101, 108 (S.D.N.Y.2002). Instead of identifying a specific structure contained in a patented

device, a patentee may claim a means for performing a specified function without expressly claiming a structure for performing that function. 35 U.S.C. § 112, ¶ 6. *See also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307 (Fed.Cir.1998) ("A means-plus-function limitation contemplated by 35 U.S.C. § 112, ¶ 6 recites a function to be performed rather than definite structure or materials for performing that function."). In such a case, the claim shall be construed to cover the structure described in the specification for performing the claimed function and any equivalent structures. *Id.* Specifically, paragraph 6 provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure ... in support thereof, and such claim shall be construed to cover the corresponding structure ... described in the specification and equivalents thereof." Moreover, under 35 U.S.C. § 112, ¶ 2, a patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

■■■ A determination of the claimed function and the corresponding structure is a matter of claim construction. *Chiuminatta,* 145 F.3d at 1308. When construing a means-plus-function claim element, the court must first identify the particularly claimed function using traditional tools of claim construction. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1210 (Fed.Cir.2003); *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1330 (Fed.Cir.2003). Applying Section 112, ¶ 6, to this first step, "[t]he statute

does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim." *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.,* 194 F.3d 1250, 1258 (Fed. Cir.1999).

■■■ The next step requires the court "to look to the specification and identify the corresponding structure for that function." *Id.* A means plus function claim limitation "shall be construed to cover the corresponding structure, material, or acts described in the specification" for performing the specified function, "and equivalents thereof." 35 U.S.C. § 112, ¶ 6. *See Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1375 (Fed.Cir.2003).[8] However, a " 'structure disclosed in the specification is a "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.' " *Id.* (quoting *B. Braun Med. Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424 (Fed.Cir.1997)). *See also Medtronic, Inc. v. Advanced Cardiovascular,* 248 F.3d 1303, 1310–13 (Fed.Cir.2001); *Personalized Media v. Int'l Trade Comm'n,* 161 F.3d 696, 705 (Fed.Cir.1998). "The duty of a patentee to clearly link or associate structure with the claimed function is the *quid pro quo* for allowing the patentee to express the claim in terms of function under section 12, paragraph 6." *Elekta AB,* 344 F.3d at 1211 (citing *Budde v. Harley–Davidson, Inc.,* 250 F.3d 1369, 1377 (Fed.Cir.2001)).

■■■ Moreover, the structure must be capable of performing the claimed function. *Cardiac Pacemakers, Inc. v. St. Jude Med. Inc.,* 296 F.3d 1106, 1114 (Fed. Cir.2002); *see also Omega Eng'g,* 334 F.3d

8. Thus, although it is ordinarily improper for a court to limit the scope of a patent claim to examples and embodiments disclosed in the specification, an exception exists for "means plus function" claims, which are construed to cover only corresponding structure, material, or acts described in the specification, or equivalents thereof. *Transclean Corp. v. Bridgewood Servs., Inc.,* 77 F.Supp.2d 1045, 1066 (D.Minn.1999).

at 1321 ("the structure must be necessary to perform the claimed function"). "[T]he statute does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem.*, 194 F.3d at 1258. *See Wenger Mfg., Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225 (Fed.Cir.2001) (under statutory means-plus-function provision, a court may not import functional limitations that are not recited in the patent claim, or structural limitations or aspects from the written description that are unnecessary to perform the claimed function). A claim is valid even if only one embodiment discloses corresponding structure. *Cardiac Pacemakers*, 296 F.3d at 1113. However, if the court's inquiry "reveals that no embodiment discloses corresponding structure, the claim is invalid for failure to satisfy the definiteness requirement of § 112, ¶ 2." *Id.* at 1114 (citing *Budde*, 250 F.3d at 1376). *See also Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352 (Fed.Cir.1999) (although patentees are not necessarily limited to their preferred embodiment, interpretation of a means-plus-function element requires the court to consult the structure disclosed in the specification, which often describes little more than the preferred embodiment). While courts must construe claims to preserve their validity, this may not be possible when the specification fails to disclose structure corresponding to the claimed function. *Cardiac Pacemakers*, 296 F.3d at 1114.

The court's inquiry is "undertaken from the perspective of a person of ordinary skill in the art." *Id.* It is important, however, for the court to determine "whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure." *Elekta AB*, 344 F.3d at 1212. There must be such a specific structure disclosed in the specification. *Ishida Co.*

*v. Taylor*, 221 F.3d 1310 (Fed.Cir.2000). If the specification does not adequately disclose a particular structure as the structure that performs the recited function, then the claim limitation is indefinite, the claim does not "particularly point out and distinctly claim" the invention, and the claim is consequently invalid under 35 U.S.C. § 112, ¶ 2. For example,

> [a]lthough paragraph six statutorily provides that one may use means-plus-function language in a claim, one is still subject to the requirement that a claim "particularly point out and distinctly claim" the invention. Therefore, if one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language. If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.

*In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed.Cir.1994) (en banc); *see also B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed.Cir.1997).

In construing a "means plus function" claim, a number of factors may be considered, including the language of the claim, patent specification, the prosecution history of the patent, other claims in the patent, and expert testimony. *In re Hayes Microcomputer Products, Inc. Patent Litigation*, 982 F.2d 1527 (Fed.Cir. 1992); *Durango Associates, Inc. v. Reflange, Inc.*, 843 F.2d 1349 (Fed.Cir.1988); *Palumbo v. Don–Joy Co.*, 762 F.2d 969 (Fed.Cir.1985). Statements made during the prosecution relating to structures disclosed in the specification are also relevant to determining the meaning of means-plus-function limitations of claims. *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206 (Fed.Cir.1998). Prior art patents may also

be considered. *See, e.g., Alpex Computer Corp. v. Nintendo Co., Ltd.,* 102 F.3d 1214 (Fed.Cir.1996) (prior art patent which patent applicant distinguished during prosecution of patent for microprocessor-based home video game system as to particular means-plus-function claims of patent, was also relevant to construction of other means-plus-function claims of patent, as all claims at issue related to same structure of same display system); *RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440 (Fed.Cir.1984) (as regards element of a claimed invention expressed in terms of a "means-plus-function," a prior art reference does not meet the claim absent a structure in the prior art reference which is capable of performing the functional limitation of the means); *NCR Corp. v. Palm, Inc.,* 217 F.Supp.2d 491, 517 (D.Del.2002) ("[Prior] art structures should be construed as being corresponding structures where they are capable of performing the claimed function and described as corresponding structure in the specification.").

Defendants maintain that the specification of the '182 Patent fails to disclose a corresponding structure for the "means for validating" and "means for dispensing" limitations. Defendants seek summary judgment based on their contention that Claim 1 of the '182 Patent is invalid for its noncompliance with 35 U.S.C. § 112. Addressing the invalidity issue is therefore intertwined with the steps the Court must take in construing the means-plus-function limitations, because the Court must identify the corresponding structure in her claim construction. *See Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1379 (Fed.Cir.1999) (noting that analysis of whether there is sufficient disclosure of structure is "inextricably intertwined" with claim construction); *Personalized Media v. Int'l Trade Comm'n,* 161 F.3d 696, 705 (Fed.Cir.1998) ("A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims.").

The parties agree that two of the disputed Claim 1 limitations—"means for dispensing" and "means for validating"—are written in "means-plus-function" format. However, the fact that both parties agree that a limitation is written in means-plus-function format does not relieve the Court of the responsibility to determine for herself that the element invokes 35 U.S.C. § 112, paragraphs 2 and 6. *See Rodime PLC v. Seagate Tech., Inc.,* 174 F.3d 1294, 1302 (Fed.Cir.1999). In determining whether a claim element is a means-plus-function limitation, the Court applies a presumption that patentees using the word "means" intended to claim a means for performing a specified function without expressly claiming a structure for performing that function within the language of the claim itself. *Id.* This presumption is only overcome in two instances First, a claim that uses the word "means" but does not state any corresponding function is not a means-plus-function claim limitation. Second, a claim that uses the word "means" and states a corresponding function, but goes on to recite sufficient structure or material for performing that function is also not a means-plus-function claim limitation. *Id.*

Here, the "means for dispensing," invokes the term "means," states a corresponding function ("for dispensing"), and does not go on to explicitly recite any structure for doing so. This claim element is therefore a means-plus-function claim limitation and will be analyzed as such. As previously mentioned, the "means for dispensing" claim limitation is the only one addressed in this Order.

### 2. Consideration of Gafford's Testimony

Defendants contend that Gafford's Declaration should be stricken and not consid-

ered for several reasons. Defendants' main contention is that the ordinary language of the specification provides the function of the means-plus-function claim limitations, fails to disclose any structure to perform the recited functions, and that Gafford's testimony is not needed for claim construction. According to Defendants, no ambiguity exists in the language used in the specification that would require the consideration of extrinsic evidence.

■■■■■ Default Proof relies primarily on the testimony of Mr. Gafford for its contention that there is more than sufficient structure disclosed that corresponds to the "dispensing" within the meaning of Claim 1. Whether the patent specification discloses sufficient structure to support a means-plus-function function limitation should be determined from the perspective of one skilled in the art.[9] *Budde v. Harley–Davidson, Inc.,* 250 F.3d 1369, 1376 (Fed.Cir.2001); *Atmel Corp. v. Information Storage Devices, Inc.,* 198 F.3d 1374, 1379 (Fed.Cir.1999). However, it is impermissible for a party to use expert declarations to rewrite the patent's specification and to create links between a structure and the recited function where the specification provides none. *See Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1332 (Fed.Cir.2003) (rejecting expert testimony when the patent specification did not link function with structure identified by expert). Indeed, courts have noted that "[i]t is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent." *Medical Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1212

---

9. Default Proof has offered Gafford's testimony as that of someone with "ordinary skill in the art," not as an expert. Patent claim terms must be construed as they would be understood by a person of ordinary skill in the art to which the invention pertains. *Searfoss v. Pioneer Consol. Corp.,* 374 F.3d 1142, 1149 (Fed.Cir.2004). Defendants offer no authority to support their argument that Mr. Gafford's testimony is not admissible to aid the Court in claim construction simply because he has not been qualified as an expert. Moreover, Defendants have not put forward any convincing arguments as to why Mr. Gafford may not be considered to have the knowledge of someone with "ordinary skill" in the relevant art.

Whether Gafford's opinions constitute "expert" testimony or not, they are undoubtedly "extrinsic evidence" for purposes of claim construction. "In determining the relevant art for purposes of addressing issues of patent validity, the court must look to the nature of the problem confronting the inventor." *Bancorp Servs. LLC v. Hartford Life Ins. Co.,* 359 F.3d 1367, 1375 (Fed.Cir.2004) (citing *Orthopedic Equip. Co. v. United States,* 702 F.2d 1005, 1009 (Fed.Cir.1983)). The problem facing the inventor in this case was to devise a computer-based system for dispensing and validating debit cards for purchase. Gafford's identification of the relevant art as "the art of the design, development, programming and manufacture of computer networks and control systems for use in real-time control or 'point-of-sale' retail applications" (Gafford Decl., ¶ 6), does not seem to miss the mark. The relevant art includes computer networks used in transaction processing, which is a field in which Gafford has experience since approximately 1986, and in which he continues to have some experience. Therefore, the Court finds that Gafford is qualified to testify as a person of ordinary skill in the relevant art. Because Mr. Gafford's testimony may conceivably be admissible at trial as either expert or lay opinion testimony, it is admissible for purposes of summary judgment. *See* FED. R. EVID. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."); FED. R. EVID. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").

(Fed.Cir.2003). If the court considers extrinsic evidence, it does so to aid its construction of the claims and not for the purposes of resolving factual disputes. *See Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1376 (Fed.Cir. 2001) (rejecting plaintiff's argument that issue of indefiniteness turned on underlying factual dispute).

In *Vitronics,* evidence was admitted in the form of expert testimony regarding how those skilled in the relevant art used a disputed claim term. 90 F.3d at 1585. The Federal Circuit determined the trial judge erred in relying on this expert testimony because the testimony "var[ied] or contradicted the manifest meaning of the claims." *Id.* In so finding, the Federal Circuit stated:

> [R]egardless of how those skilled in the art would interpret a term in other situations, where those of ordinary skill, on a reading of the patent documents, would conclude that the documents preclude the term being given the meaning propounded by the expert witnesses, we must give it the meaning indicated by the patentee in the patent claim, specification and file history.

*Id.* The Federal Circuit ultimately found that the specification clearly and unambiguously defined the claim term in dispute and so the trial judge's reliance on the expert testimony was incorrect. *Id.*

Indeed, the court strongly noted that patent documents are *rarely* insufficient to aid the court in properly construing claims. *Id.* However, the Federal Circuit stated that even in those rare circumstances when the documents are insufficient:

> [P]rior art documents and dictionaries, although to a lesser extent, are more objective and reliable guides. Unlike expert testimony, these sources are accessible to the public in advance of litigation. They are to be preferred over opinion testimony, whether by an attorney or artisan in the field of technology to which the patent is directed. Indeed, opinion testimony on claim construction should be treated with the utmost caution, for it is no better than opinion testimony on the meaning of statutory terms.

*Id.* The Court examines statements made by Gafford consistent with the above principles.

The undersigned finds that the language of the "means for dispensing" claim limitation is ambiguous, not with respect to the recited function, but with respect to the corresponding structure(s) disclosed, as further explained below. Therefore, the Court has considered certain portions of Mr. Gafford's testimony solely for the purpose of determining whether a corresponding structure is disclosed for the "means for dispensing" claim limitation. In particular, the Court considered Mr. Gafford's statements in determining whether a person of ordinary skill in the relevant art would understand that a corresponding structure is disclosed in the specification. In the discussion *infra,* the Court examines the specific assertions contained within in Gafford's Declaration and determines whether or not, and how, they have aided the Court in construing the "means for dispensing" claim element. As indicated, where Gafford's statements are either unsupported or contradicted by the express language of the written description, the undersigned has not relied on Gafford's testimony.

### 3. *"Means for Dispensing"*

The Court finds that the function associated with the "means for dispensing" claim limitation is *distributing or dealing out debit cards to debit card purchasers.* (*See The New Shorter Oxford English Dictionary (Oxford),* p. 698) (Gafford Decl., Ex. 5); *The American Heritage Dictio-*

*nary of the English Language* (3d ed. Houghton Mifflin 1996, at 536)(emphasis added). This is an ordinary meaning of "dispensing," and the claims and specification of the '182 Patent do not define the term to have a different meaning. As set forth below, Default Proof's assertion that "the plain and ordinary meaning of the term 'dispense' is to . . . 'give out,' 'hand out,' or 'hand over'" (Pl. Resp. to Home Depot's Mot. for an Order Construing Claim 1 of U.S. Patent No. 6,405,182, at 15–16) is not supported by the intrinsic evidence.

The larger dispute is not over the function of "dispensing", but over the "dispenser," and particularly: (1) whether or not a corresponding structure is disclosed to perform the "dispensing" function, and (2) whether the structure that corresponds to the dispensing function must be an apparatus, *i.e.,* a machine with component parts, or may include a person manually operating an apparatus. Defendants argue that the "means for dispensing" is a separate component from the "point of sale assembly" because Claim 1 recites these means separately and part B of the claims states that the debit cards are dispensed by the "means for dispensing" only after a "validation signal is received from said point-of-sale assembly." Moreover, Defendants argue that there is no corresponding structure disclosed, but if a corresponding structure is identified with the "dispensing" function, it must be a machine and cannot be a person. In contrast, Default Proof argues that the "dispensing" function in Mr. Cuervo's invention can be, and is performed either wholly automatically or it can include a "merchant" operating component parts of the POS terminal. Default Proof's position is that the "corresponding structures" for the "means for dispensing" include specific parts of the POS terminal, and need not be separate from the terminal.

The specification of the '182 Patent also sheds little or no light on the meaning of "dispensing." Although the '182 Patent uses the terms "dispensing" and "dispensers" several times in the specification, it never provides an example of what act constitutes "dispensing," what structure or device might serve as a "dispenser," or how it might work. The Court starts her analysis, however, as she is required to do, with an analysis of the patent claims and the written description or specification.

First, with respect to whether the "dispenser" is contained within the "point-of-sale terminal," the specification is clear. Figure 1, which depicts the hardware involved in Mr. Cuervo's invention, shows two separate boxes or "structures" for the "P.O.S." and the "DISPENSER." Moreover, section B of the claim prescribes that the cards are "dispensed only after a first predetermined number of conditions have been met and said validation signal is received from said point-of-sale terminal," which shows that the "dispenser" and the point-of-sale terminal work together but are not one and the same. ('182 Patent, col. 4, lines 8–11). Figure 2 is not helpful because it simply reflects that cards are dispensed as one of the steps in the point-of-sale transaction, but does not indicate the structures involved in the "dispensing" function.

Turning to the prosecution history, most telling is Mr. Cuervo's statement during the prosecution of the '182 Patent about the differences between an ATM machine and a point-of-sale assembly, *i.e.,* that "[a]n automated teller machine dispenses money through its mechanism in response to a validated transaction," while a "[*a* ] *point-of-sale assembly does not include such a mechanism.*" (Gafford Decl., Ex. 4, p. 52)(emphasis added). In this statement, Mr. Cuervo recognized that a point-of-sale assembly does not itself perform the "dis-

pensing" function. After making this statement to the patent examiner, Mr. Cuervo then proceeded to supply the examiner with "print outs of commercially available P.O.S. products." None of the components of the sample point-of-sale terminals submitted by Mr. Cuervo are associated with "dispensing" debit cards or cards of any sort; the printers and other peripheral devices described are associated rather with the printing of receipts, labels, graphics, etc. The Court finds that the intrinsic record compels a conclusion that the dispenser and the point-of-sale terminal disclosed in Mr. Cuervo's invention exist separately. Therefore, the "point-of-sale terminal" disclosed in the '182 Patent cannot be the corresponding structure that supports the "means for dispensing" claim limitation.

Next, the Court is asked to consider whether a human being may have any part in performing the "dispensing" function. The patent specification is ambiguous on this point. There are two important references made in the patent specification, and certain particulars disclosed, that suggest that the "dispenser" is a machine:

(1) The *"DISPENSER"* appears in a box on Figure 1, which particularizes the *"hardware"* of the invention. A human being cannot be "hardware.";

(2) Figure 1 does not portray a human being as being part of the "hardware." Figure 1 represents the human user of the claimed device by a stick figure, whereas it represents the "dispenser" as a box. This indicates that the dispenser is not a human being.

(3) "Dispenser 40 is *loaded with three or more stacks of debit cards* . . . ." ('182 Patent, col. 2, lines 32–33)(emphasis added). A human being cannot be "loaded with three or more stacks of debit cards."

(4) "This business process invention relates to merchants' *point-of-sale terminals (POS) becoming sellers and dis-* *pensers of debit cards,* and more particularly, to those that are particularized." (*Id.* at col. 1, lines 17–20)(emphasis added);

(5) The invention involves "[p]oint-of-sale *machines* that allow individuals to obtain debit cards." (*Id.* at Abstract)(emphasis added); and

(6) In the "Description of the Related Art," the patent attempts to distinguish the Muehlberger Patent, which it says is the "closest reference." The patent states that Muelhberger can be distinguished from "the present invention" because Muehlberger did not disclose "the use of *point-of-sale terminals (POS) to provide an injection on stacked 'virgin' debit cards* of any selected prepaid amount of funds, security information (PINS, passwords, mother's maiden name, etc.)." (*Id.* at col. 1, lines 26–29)(emphasis added). There can be no serious dispute that human beings are not "terminals" that "provide an injection on stacked 'virgin' debit cards."

The following actions during the prosecution history also support a finding that the "dispenser" must be a machine:

(1) The patent examiner read the patent to disclose a "device" similar to an ATM machine. (Gafford Decl., Ex. 4, p. 45);

(2) Mr. Cuervo stated, in a Preliminary Amendment in response to the patent examiner's rejection of his claims, that "[t]he preamble has been changed to clearly indicate that *the system claimed is an apparatus,*" and with regard to Figure 1, "[t]he original figure 1 has been broken down in two figures to *separate the hardware from the steps involved* in using it." (Gafford Decl., Ex. 4, p. 33) (emphasis added). Thus, Mr. Cuervo told the Patent Office that his invention is an apparatus containing "hardware," and those statements are binding on Default Proof. Mr.

Cuervo cannot make such statements to the Patent Office to obtain his patent claims, and then ignore those statements when he asserts those claims in a lawsuit.;

(3) Although the NURIT 2060 and NURIT 2080 point-of-sale terminals and other point-of-sale terminals disclosed by Mr. Cuervo during the patent prosecution to distinguish his invention from a similar invention involving an ATM machine, contain components that work with "human interface," none of those "human interface" products are associated with the dispensing function in the product descriptions. (Gafford Decl., Ex. 4, pp. 57–74); and

(4) In the patent examiner's remarks in the Notice of Allowability, the examiner cited the Muehlberger patent as "prior art" and stated that this patent reflected the "teaching of a POS dispensing a telephone card." Thus, despite Mr. Cuervo's statements and amendments, the examiner, at the time the patent was allowed, still believed Mr. Cuervo's invention was very similar to the Muehlberger Patent, which clearly discloses a "dispenser" that is a machine and does not contemplate, let alone require, human interaction with the machine to dispense debit cards. Indeed, all of the relevant "prior art" cited by the patent examiner in the remarks accompanying the Notice of Allowability seem to involve apparatus inventions based on the descriptions provided. (Gafford Decl., Ex. 4, p. 88).

Other patent language suggests that the dispensing function *may* involve acts by the merchant. For example,

(1) "Point–of–Sale machines that allow individuals *to obtain from participating merchants,* 'over-the-counter', *prepaid debit cards.*" ('182 Patent, Abstract)(emphasis added); and

(2) "The *merchant or dispenser* of the card . . . ." ('182 Patent, col. 2, line 25)(emphasis added).

Default Proof relies on the following statement made by Mr. Cuervo during the patent prosecution: "It is clear that *a merchant operates,* in the present invention, a P.O.S. assembly to validate a transaction prior to *dispensing* a card." (Gafford Decl., Ex. 4, p. 52)(emphasis added). Nonetheless, the patent specification does not specifically disclose any products that the merchant could operate to dispense debit cards, and none is disclosed in the file history either. For the reasons already stated, the merchant cannot "operate" a point-of-sale terminal to dispense debit cards, because the dispenser is not a component of the point-of-sale terminal. Without more, this statement by Mr. Cuervo does not establish that the "merchant" is the corresponding structure that does the dispensing.

Moreover, a review of the Muehlberger Patent provides a reasonable interpretation of what Mr. Cuervo meant when he said that the "merchant operates." The Muehlberger Patent refers to a "dispenser operator" that may be a store clerk, but this "dispenser operator" does not dispense the cards; rather, he or she simply selects the options provided to the debit card purchasers in terms of value of purchase and providers, while the card is dispensed from the "dispenser ports" in the "dispenser module."

 "When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *Arthur A. Collins, Inc. v. Northern Telecom, Ltd.,* 216 F.3d 1042, 1045 (Fed.Cir.2000). The Federal Circuit in *Kumar* supported its reliance on a prior art reference in arriving at the proper claim construction as follows:

In the present case, the Polk patent is not simply cited in the '686 patent [the patent at issue] as pertinent prior art; nor is there any showing that the Polk patent adopted a special definition at variance with that prevailing in the art. Rather, the Polk patent was considered by the both the applicant and the examiner to be highly pertinent prior art, and there is no indication that the Polk patent's express definition (even if inconsistent with the general dictionary definition) was in any way at variance with the definition that would have been used by those skilled in the art at the time. Indeed, ... Ovonic's own '440 patent, through issued some few years after the issuance of the Kumar patent, uses the same definition, thus at least suggesting that the "long range order" definition was not unique to the Polk patent.

Under these circumstances, we conclude that the Polk patent definition is to be preferred over the general dictionary definition relied upon by Ovonic. This Polk patent definition should control unless the specification clearly states an alternative meaning or this meaning was disclaimed during prosecution. *Inverness 1*, 309 F.3d [1365] at 1371–72 [ (Fed.Cir.2002) ]. Here, the specification and prosecution history do not require a different interpretation than the Polk patent definition ....

*Kumar*, 351 F.3d at 1368. Finding nothing in the intrinsic record or Mr. Gafford's testimony that is inherently inconsistent with the Muehlberger definition, and in light of the fact that the Muehlberger Patent was considered by both Mr. Cuervo and the patent examiner to be the "closest" prior art, the language of that Patent is particularly helpful in ascertaining the structure for a "dispenser" of debit or credit cards.

Default Proof also relies on the language in the preferred embodiment of the '182 Patent providing that, "Dispenser will [sic] the merchant or the entity or place selling the card...." A word or words are obviously missing from this sentence. Default Proof proposes that the Court correct the error, find that the sentence was meant to read: "Dispenser will be the merchant or the entity or place selling the card," and find that the "merchant" is the corresponding structure of dispensing. Defendants suggest that the sentence could also read: "Dispenser will be at the merchant or the entity or place selling the card," which is also plausible.

The Court will not correct the error because fixing the error would not save Claim 1. Even if the Court were to adopt Default Proof's construction of the sentence, there would still be no corresponding structure for the dispensing function. Default Proof does not even argue that a person, acting alone, could dispense the debit cards in accordance with the invention; rather, the person would "operate" a machine to dispense. There is no machine disclosed in the patent specification or file history that performs the dispensing function, alone or in conjunction with a human being. Therefore, even if the merchant were involved in the dispensing process, the other structural element of Default Proof's proposed corresponding structure is missing from the specification. In any event, the specification of the '182 Patent does not *explicitly* disclose manual "dispensing" by a person as an alternate embodiment. To find a corresponding structure, it would have to be clear that the "dispenser" may include manual operation functions, and it is not. Therefore, a merchant operating a device or devices acting in conjunction with the point-of-sale terminal is not a corresponding structure.

There is nothing in the patent language or the prosecution history affirmatively linking or associating the function of dispensing with acts by a human being.

Moreover, even if there was such a link, the case law precludes a conclusion that a human being is a corresponding structure, or an equivalent to a structure, under 35 U.S.C. § 112, ¶ 6. *See, e.g., Brown v. Davis,* 116 U.S. 237, 6 S.Ct. 379, 29 L.Ed. 659 (1886); *Application of Prater,* 56 C.C.P.A. 1381, 415 F.2d 1393, 1398 (Cust & Pat.App.1969) (citations omitted); *Davies v. United States,* 31 Fed.Cl. 769, 778 (1994); *Continental Laboratory Products, Inc. v. Medax Int'l, Inc.,* 2004 WL 3524749, *8 (S.D.Cal.1999), 1999 U.S. Dist. LEXIS 15383, *24–26.

The varied suggestions and interpretations derived from the language of the patent and the prosecution history regarding the "dispenser" create ambiguity for purposes of claim construction. In order to confirm the Court's preliminary conclusions, detailed above, regarding Mr. Cuervo's failure to disclose a corresponding structure to perform the "dispensing" function asserted in Claim 1, the Court turns to extrinsic evidence, and specifically the testimony of Thomas A. Gafford.

Initially, the undersigned notes that Gafford cannot correct the typographical error in the sentence beginning with, "Dispenser will the merchant. . . ." because, regardless of the understanding of one skilled in the relevant, and even construing the sentence to read: "Dispenser will be the merchant," the necessary corresponding structure is not disclosed. *See Aqua–Aerobic Systems, Inc. v. Aerators, Inc.,* 211 F.3d 1241 (Fed.Cir.2000) (expert testimony is often useful to clarify the patented technology and to explain its meaning through the eyes of experience, but it may not correct errors or erase limitations or otherwise diverge from the description of the invention as contained in the patent documents).

Mr. Gafford relies on the patent reference to "widely available Point–of–Sale terminals," which may include many component parts and may be capable of dispensing cards. The "widely available Point–of–Sale terminals" disclosed in Mr. Cuervo's '182 Patent specification (col. 1, line 48) contemplate the inclusion of human acts; they are actually designed for interaction with a clerk, as shown by their incorporation of a keyboard, a printer and an LCD display (Gafford Decl. ¶ 34). However, the point-of-sale terminals do not always include these parts. More importantly, there is absolutely no evidentiary proof in the intrinsic record, the prosecution history, or Mr. Gafford's testimony, of a component part of a point-of-sale terminal that actually "distributes" debit cards, which is the recited function. That a device may perform another function in connection with the kind of point-of-sale transaction disclosed in the '182 Patent does not render it a corresponding structure that supports the "means for dispensing" claim limitation.

Mr. Gafford understands Figure 1 of the patent to establish that the "dispenser" may be any one of a wide variety of peripherals attached to the data processing portions of the "POS terminal," and in communication with those portions of the terminal. Mr. Gafford believes that the "widely available Point–of–Sale terminals" disclosed in Mr. Cuervo's specification include at least three alternative "corresponding structures" used for dispensing, each of which supports the "means for dispensing" claim limitation. The first structure is a kiosk that is purportedly associated with POS terminals that sell prepaid telephone cards. According to Gafford, the Muehlberger Patent discloses this type of "means for dispensing" as an embodiment. This type of kiosk accepted cash or credit cards and sold prepaid telephone cards. With these devices, a person would insert cash or a credit card and receive a telephone card good for a fixed amount.

The second "corresponding structure" for the "means for dispensing," according to Gafford, is the printer peripheral portion of the POS terminal, which prints out a receipt at the end of each transaction stating that the transaction is complete and that the debit card is being dispensed. After "predetermined conditions," such as establishing the line of credit, have been met, presumably through "validation," the receipt prints out identifying that the specific gift card number that has been activated is dispensed to the customer. At that point, Gafford contends that all the acts performed by the "corresponding structures" specified by Claim 1 are complete.

Finally, the third "corresponding structure" for the "means for dispensing" identified by Gafford is the LCD display or CRT peripherals of the POS terminal operated by the "merchant." With this corresponding structure, the "merchant operates together" with the LCD or CRT display to "dispense" the debit card. The third alternative corresponding structure includes acts by a "merchant"—a person—while the first two do not.

A review of the intrinsic record negates even the possibility that any of the structures identified by Gafford may be corresponding structures of the "means for dispensing." First and foremost, none of these devices is mentioned anywhere in the patent. While commercially available products were cited by Mr. Cuervo during the prosecution history, none of these peripherals or attachments to the point-of-sale terminal are associated with the dispensing of cards, but only with the dispensing of receipts, graphics, labels, tickets, etc. The patent never even hints that the claimed machine prints any kind of a receipt, or that a receipt is in any way involved in the invention. Indeed, the '182 Patent does not contain the word "printer," "print," "imprint," or "receipt." Be-

cause there is no suggestion any where in the patent (or anywhere else) that any of these structures identified by Gafford can dispense *debit cards*, the '182 Patent cannot possibly have linked such structures to "dispensing" debit cards. While there may be commercially-available structures or products used with point-of-sale terminals to dispense cards, such structures are not disclosed in the intrinsic record, the prosecution history, or by Mr. Gafford.

A "kiosk" is not mentioned anywhere in the '182 Patent, or in its prosecution history. Nor, contrary to Mr. Gafford's assertion in paragraph 35 of his Declaration, is there a mention of a "kiosk" in the prior-art Muehlberger Patent. The word does not appear anywhere in that patent. Additionally, the Muehlberger Patent does not disclose a human being performing any acts in furtherance of "dispensing" debit cards.

However, Muehlberger specifically and sufficiently disclosed corresponding structures to perform the functions involved in that patent—something Mr. Cuervo failed to do:

> To accomplish such functions as herein described, and as illustrated with reference to FIG. 7, the phone card dispenser 10 in a preferred embodiment of the present invention comprises a microprocessor 45 having a read only memory, ROM 76, and a battery-backed random access memory, RAM 78. The operating software (not included) resides in the ROM 76 and the variable data, for example transactions, names and values are kept in the RAM 78. The microprocessor 74 interfaces directly with an encrypted PIN pad or input key pad 20 and a magnetic strip card reader or credit card reader 16 as earlier described. The key pad 20 serves as an entry facility for secret PIN codes, such as required for use with ATM cards.

Further, the key pad 20 communicates directly with the processor or clearing house for key codes and data entry in order to maintain security. The card reader 16 serves to read the customer's card number, expiration date, routing codes, and names for the validation in electronic debit facility whether it be the clearing house or bank with whom on line communication is made.

Inputs and outputs to the primary and optional peripheral devices are handled via an interface and control board 80. A selection button matrix with LED indicators, described earlier as the value and carrier selection buttons 18, presents the customer with various choices for telephone card type and described earlier in the functional flow chart of FIGS. 5 and 6. In the preferred embodiment of the present invention, on line communications with the clearing house and telecommunications carrier is performed via the modem 82 interfacing with the microprocessor 74 through the interface and control board 80. The bill receiver 14, and receipt printer 35 having a printer output port 34 earlier described, interface with the microprocessor 74 through the interface and control board 80 as well.

The control and connections to a single dispenser module 11 or multiple dispenser modules 11, 11a, as illustrated with reference to FIG. 7, are performed by the interface and control board 80 through a marshalling and distribution board 86. Each card dispenser module 11 or 11a has an associated bar code sensor 84, 84a, and paper and card storage 85, 85a also interfacing with the interfacing control board 80 through the marshalling and distribution board 86. As illustrated with reference to FIG. 7 and as earlier described, it is anticipated that multiple dispenser modules 11 and barcode sensors 84 are located within a single dispenser apparatus 10.

In the '182 Patent, there is no support for peripheral devices doing the dispensing— no link. And, although similar peripheral devices are specified by Muehlberger, none of them dispenses the telephone cards in the invention.

Unlike the Muehlberger Patent, the '182 Patent contains no mention, or even a suggestion that the printing of a receipt is involved in any way with the claimed invention. Even if a printer could somehow "dispense" a debit card, there is absolutely nothing in the patent specification which identifies a printer as a structure which can perform the function of "dispensing." The patent does not disclose a receipt printer, and cannot link a receipt printer to the function of "dispensing." Consequently, a receipt printer cannot be the corresponding structure for the "means for dispensing."

Mr. Gafford's suggestion that an LCD or CRT display screen can be the structure by which a debit card is dispensed also fails for several reasons. First, the '182 Patent does not mention either of these devices. Nor were any of them ever mentioned during prosecution of the patent. Mr. Gafford offers no evidence to show that one of ordinary skill at the time of the patent application would have considered either of these devices to be capable of "dispensing," or as Default Proof argues, "handing over," a debit card.

Mr. Gafford's further suggestion that the "means for dispensing" may be a merchant operating an LCD or CRT display screen (which he says are parts of the point-of-sale assembly itself) directly contradicts the plain language of Claim 1 of the patent, which, as discussed above, confirms that the "means for dispensing" is separate from the "POS assembly." The suggestion also contradicts Figure 1 of the patent, which further confirms that the

"dispenser" is physically distinct and separate from the POS.

All of these observations based on the intrinsic record strongly suggest that the "means for dispensing" of Claim 1 must be an apparatus of some sort. But they do not explain what its structure is. The term remains fatally indefinite. Simply put, the claims, specification, and prosecution history of the '182 Patent do not disclose any structure for "dispensing" debit cards as required to find the "means for dispensing" claim limitation valid under 35 U.S.C. § 112, ¶ 2. The closest the patent comes to disclosing such a structure is the inclusion of a box in Figure 1 labeled "Dispenser." But this simple schematic does not in any way disclose what the physical structure is or how it could be used to dispense debit cards.

The Court is required to construe the "means for dispensing" claim limitation as only covering those **structures** specifically described in the specification and their equivalents. The specification of the '182 Patent certainly does not definitively describe a human being as a structure capable of performing the "dispensing" function of the claims. Finally, because the claims, specification and prosecution history do not describe any structure for dispensing debit cards, there cannot be any structures that are "identical to or the equivalent of the structures described in the patent specification." Consequently, Claim 1 of the '182 Patent is invalid due to indefiniteness under 35 U.S.C. § 112, ¶ 2.

### B. Invalidity of Claim 1 of the '182 Patent Based on the Indefiniteness of the "Means for Dispensing" Claim Limitation

A determination of invalidity for indefiniteness is, in essence, just another aspect of claim construction. Either the Court, as a matter of law, is able to construe the claims at issue, or alternatively, as matter of law, she concludes that she is unable to construe the claims because they are fatally indefinite and invalid under 35 U.S.C. § 112, ¶ 2. Here, a reasonable competitor reading the '182 Patent would have no way of understanding the structure of the claimed "means for dispensing" or how it operates, and therefore would have no way of knowing whether its own invention would come within the ambit of the claim. That is the essence of indefiniteness.

Because the '182 Patent specification fails to disclose any structure that is specifically linked to the recited function of distributing or dealing out debit cards to purchasers, the "means for dispensing" limitation is indefinite for failing to "particularly point out and distinctly claim" the purported invention, and Claim 1 is indefinite. *See, e.g., Endevco Corp. v. Chicago Dynamic Indus., Inc.,* 268 F.Supp. 640, 654 (N.D.Ill.1967) (one indefinite clause in a claim renders the claim as a whole indefinite). This does not mean, however, that the rest of the claims asserted in the '182 Patent are invalid. The infringement and validity analyses must be performed on a claim-by-claim basis. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed.Cir.2001). *See* 35 U.S.C. § 282 ("Each claim of a patent whether in independent, dependent, or multiple dependent form, shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent on an invalid claim."); *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,* 370 F.3d 1131, 1148–49 (Fed.Cir.2004) ("Each claim defines a separate invention, whether or not written in independent form; and its validity stands or falls separately...."). *See also Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.,* 264 F.3d 1344 (C.A.Fed.2001) (district court erred by holding all claims of patent invalid during

patent infringement suit in which alleged infringer counterclaimed for declaration of invalidity, even though parties had cross-moved for summary judgment respecting validity on all claims, where parties presented evidence or argument only with respect to some of patent's claims, and some of non-litigated claims deemed invalid were dependent claims containing limitations in addition to those contained in independent claims that were properly found invalid); *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443 (Fed.Cir.1986) (a patent is presumed valid and each claim is presumed valid independently of the validity of other claims); *Maloney–Crawford Tank Corp. v. Sauder Tank Co., Inc.*, 465 F.2d 1356 (10th Cir.1972) (fact that a particular claim within a patent is invalid, without more, cannot invalidate the entire patent; each claim of patent must be considered separately and each must stand or fall alone).

Default Proof, however, has only sued on Claim 1 of the '182 Patent, which has been found invalid in this Opinion. Throughout the First Amended Complaint for Patent Infringement, Default Proof alleges that the Defendants "[have] infringed at least claim 1 of the '182 patent." (First Am. Compl. ¶¶ 19–21). Although Default Proof alleges that "at least" Claim 1 was infringed, there are no allegations in the First Amended Complaint relating to the other claims, only to Claim 1. Therefore, the other six claims of the patent are not a basis for the infringement claim asserted in the First Amended Complaint. Moreover, in its briefs in response to Defendants' Motions, Default Proof has not argued that claims 2 through 7 of the '182 Patent prevent a finding that Claim 1 is invalid, or that the entire patent is invalid. Accordingly, Defendants are entitled to summary judgment in their favor.

There is one last argument by Default Proof that the Court will address. Default Proof argues that the statutory presumption that patents are valid [10] prevents a finding of invalidity in this case. First, Default Proof provides no legal authority to support its argument that the only limitations of a patent claim that require support in the specification are those listed by the examiner in a Notice of Allowability. Moreover, the file history does not reflect that the examiner who allowed the '182 Patent considered or analyzed the "means for dispensing" and "means for validating" claims as means-plus-function limitations on Mr. Cuervo's invention. The prosecution history of the '182 Patent contains no determination by the Patent Office that the '182 Patent described "corresponding structures" to support any means-plus-function limitation.

Given that there was no mention of the means-plus-function or "corresponding structures" issues during prosecution of the '182 Patent, there is no evidence to support Default Proof's repeated assertions that the "skilled PTO Examiner" expressly found that such structures were described in the specification of the patent. Regardless of whether the examiner decided the issue or not, a patent examiner's decision, on an original or a reissue application, is never binding on the court; it is, however, evidence the court must consider in determining whether a party asserting invalidity met its statutory burden by "clear and convincing evidence." *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed.Cir.1985). *See Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320 (Fed.Cir.2000) (district court was not required to defer to finding of patent examiner that new claims added to patent application were "supported by the specs," in determining whether claims met written

---

**10.** *See* 35 U.S.C. § 282 ("A patent shall be presumed valid.").

description requirement, as court found that examiner's statement was not persuasive in light of all the evidence in the case); *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082 (Fed.Cir.1985) (fact of allowance of claim is at least sufficient "evidence" to place on challenger the burden of proving the examiner wrong); *Coakwell v. U.S.*, 155 Ct.Cl. 193, 292 F.2d 918 (1961) (even if patent office determination in patent proceeding is not binding as res judicata, unsuccessful party must show by most convincing evidence that the patent office decision was wrong).

■ Admittedly, then, it is true that when the definiteness of a means plus function claim limitation is challenged under 35 U.S.C. § 112, ¶ 2, the statutory presumption of validity includes "the requirement that a lack of corresponding structure be proven by clear and convincing evidence." *Budde v. Harley–Davidson, Inc.*, 250 F.3d 1369, 1380 (Fed.Cir. 2001).[11] Defendants, however, have met this burden by explaining to the Court,

quite convincingly, how the intrinsic record establishes that Claim 1 is invalid for indefiniteness of the "means for dispensing" claim limitation. The Court has considered Mr. Gafford's testimony in her analysis and found that most of his opinions and statements are contradicted by the intrinsic record. The intrinsic record, including the prosecution history, therefore, provides "clear and convincing evidence" of the lack of corresponding structure to support the "means for dispensing" claim limitation. *See University of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916 (Fed.Cir.2004) (Section 282 placing burden of proof on party seeking to invalidate patent does not foreclose possibility of that party demonstrating that patent in suit proves its own invalidity). This is simply not a case involving a "close question of indefiniteness" that should be resolved in favor of the patentee. *See Exxon Research and Eng'g Co. v. U.S.*, 265 F.3d 1371, 1380 (Fed.Cir.2001) ("In light of that statutory presumption [in 35 U.S.C. § 282]

---

**11.** *See also High Concrete Structures, Inc. v. New Enter. Stone and Lime Co., Inc.*, 377 F.3d 1379, 2004 WL 1689152 (Fed.Cir.2004) (a patent is presumed valid, and can be proved invalid only by clear and convincing evidence); *Intertool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 70 U.S.P.Q.2d 1780 (Fed.Cir.2004) (a party alleging that a patent is invalid for failure to comply with the written description requirement has the burden of establishing by clear and convincing evidence that the requirement was not met, in light of the presumption of validity). Whether the written description requirement has been satisfied by clear and convincing evidence is a question of fact. *Cordis Corp. v. Medtronic AVE., Inc.*, 339 F.3d 1352 (Fed.Cir.2003); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054 (Fed.Cir.2004) (to establish patent invalidity, supporting facts must be shown by clear and convincing evidence); *Intel Corp. v. VIA Technologies, Inc.*, 319 F.3d 1357 (Fed.Cir.2003) (any fact critical to a holding on indefiniteness must be proven by the challenger by clear and convincing evidence). *Dana Corp. v. American Axle & Manufacturing, Inc.*, 279

F.3d 1372 (Fed.Cir.2002) (court may not invalidate the claims of a patent without construing the disputed limitations of the claims and applying them to the allegedly invalidating acts, and such evaluation must recognize the statutory presumption of validity and the need for facts supporting a conclusion of invalidity by clear and convincing evidence); *Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14 (Fed.Cir.2000) (in rendering a decision on a motion for summary judgment, a court must view the evidence presented through the prism of the substantive evidentiary burden that would inhere at trial, and summary judgment of patent invalidity, therefore, must be predicated on facts established by clear and convincing evidence). While a patentee has the burden of going forward with rebuttal evidence once a challenger has presented a *prima facie* case of invalidity, the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation. *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206 (Fed. Cir.1998).

of validity and the differences in posture between an applicant whose application has been rejected and a patentee with an issued patent, *close questions of indefiniteness* in litigation involving issued patents are properly resolved in favor of the patentee.").

### C. An Infringement Analysis is Neither Necessary nor Possible to Perform

■ There are two ways for a plaintiff to show patent infringement: literal infringement or infringement by equivalence, referred to as infringement under the "doctrine of equivalents." A literal infringement analysis involves two steps: (1) proper interpretation of the asserted patent claim(s) (*i.e.*, "claim construction") to determine their scope and meaning; and (2) comparison of the properly interpreted claim(s) and the defendant's product (*i.e.*, claim application) in order to determine whether the claims can be read onto the accused product. *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir.2001); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580–81 (Fed. Cir.1996).

■ After a court construes the claims of the patent, the properly construed claims must be compared to the accused device or method to determine whether the latter has "all of the claim limitations." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed.Cir.2002). To establish literal infringement, Default Proof must show that "every limitation set forth in a claim [is] found in an accused product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir. 1995). If any limitation is absent, there cannot be a finding of infringement.

■ If there is no literal infringement, a device or method may nonetheless infringe a patent under the doctrine of equivalents. *Sage Products, Inc. v. Devon*

*Indus., Inc.*, 126 F.3d 1420, 1423 (Fed.Cir. 1997) ("A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device."). One way that a plaintiff may show infringement under the doctrine of equivalents is by establishing that the offending device or method functions in substantially the same way to achieve substantially the same result as the device or method covered by the patent. *Graver Tank*, 339 U.S. at 608, 70 S.Ct. 854. Another way is by showing that the claim limitation or element is "equivalently present" in the accused device because there are only "insubstantial differences" between the missing claim limitation or element and corresponding aspects of the accused device. *Zodiac Pool Care, Inc. v. Hoffinger Industries, Inc.*, 206 F.3d 1408, 1415 (Fed.Cir. 2000). Equivalence must be considered on a limitation-by-limitation basis; in other words, it must be determined whether *each* of the claim limitations are "equivalently present" in the accused product.

Here, the Court was not able to fully construe the "means for dispensing" claim limitation of Claim 1. The intrinsic record and the extrinsic evidence presented do not permit the Court to arrive at a proper construction of "means for dispensing," given that the Court cannot find in the language of the claims, or in the specification, a corresponding structure disclosed to perform the dispensing function. Moreover, there is no link in the specification to a corresponding structure known in the art to perform the precise function. Thus, step 1 of the patent infringement analysis—claim construction—has not been completed with respect to the "means for dispensing" claim limitation.

■ Application of the "means for dispensing" claim limitation to Home Depot, Starbucks and Wal–Mart's accused

systems, both literally or under the doctrine of equivalents, is impossible. As a matter of law, if Claim 1, the only independent claim in the patent, is not infringed, no other claim of the patent is infringed. *See Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1553 n. 10 (Fed.Cir. 1989) ("Infringement of an independent claim would result in the same damage award as would infringement of all claims dependent thereon and non-infringement of an independent claim carries with it non-infringement of all claims dependent thereon. If validity were in issue, dependent claims might serve a useful role, for a necessarily narrower dependent claim may be valid when the claim from which it depends is not."). If the *entire* '182 Patent is invalid, *which is not decided in this Order,* there can be no infringement of an invalid patent. *See, e.g., Reinke Mfg. Co., Inc. v. Sidney Mfg. Corp.,* 594 F.2d 644, 645 (8th Cir.1979); *Popeil Bros., Inc. v. Schick Elec., Inc.,* 494 F.2d 162, 167–68 (7th Cir.1974); *Del Mar Eng'g Laboratories v. United States,* 207 Ct.Cl. 815, 524 F.2d 1178, 1186 (1975) ("In view of the conclusion on validity, it is unnecessary to reach the question of infringement, for an invalid patent cannot be infringed.") (citation omitted).

## V. CONCLUSION

Upon due consideration, and for the foregoing reasons, it is

12. This Order does not find all of the claims

**ORDERED AND ADJUDGED** as follows:

1. Home Depot's Motion for an Order Construing Claim 1 of U.S. Patent No. 6,405,182 (D.E.89) is **GRANTED** in part.

2. Home Depot's Motion for Summary Judgment that the Claims of U.S. Patent No. 6,405,182 are Invalid (D.E.90) is **GRANTED** in part.[12]

3. Starbucks and Wal–Mart's Motion for Summary Judgment of Non-infringement (D.E.85), filed under seal, is **DENIED** as moot.

4. Home Depot's Motion for Summary Judgment that its Gift–Card Program does not Infringe any Claim of U.S. Patent No. 6,405,182 (D.E.94), filed under seal, is **DENIED** as moot.

5. Defendants shall file a proposed Final Judgment consistent with this Order by on or before *October 11, 2004.* A Final Judgment consistent with this Order will be entered in favor of Defendants, Home Depot, Starbucks and Wal–Mart, and against Default Proof, by separate order pursuant to Fed. R.Civ.P. 58 upon receipt of the proposed Final Judgment.

6. The Clerk of Court is instructed to **CLOSE** this case, and all pending motions not otherwise ruled upon herein are **DENIED** as moot.

of the '182 Patent invalid.

1358

Figure 1

**APPENDIX**

Figure 2

1360

```
 Case Selection
Dkt type: cv Case Number: 03-20094 Division: 1 Miami
 Title : Default Proof .V. Home Depot U.S.A.

Filed Entry Date Last Update History ID Docketed by
9/29/04 10/1/04 **/**/** 6460564 tb
 +------------------------------------------------------------------+
 SEALED DOCUMENT placed in vault

 +viewing docket text-------------------------------------------+
Transaction: seal doc -/ -/ - - -

 Command mode (? for commands)
```

**Attached to D.E. #** _250_